# In the United States Court of Federal Claims

### No. 15-1052C
### Filed: October 25, 2016

* * * * * * * * * * * * * * * * * *   *
                                  *

**MOHD N. REFAEI,**

              **Plaintiff,**

**v.**

**UNITED STATES,**

              **Defendant.**

* * * * * * * * * * * * * * * * * *   *

**Contract; Appointment; Motion to Dismiss; Jurisdiction; Due Process Clause.**

    **Michael T. Milligan**, El Paso, Texas, for plaintiff.

    **Jessica L. Cole**, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington D.C., for defendant. With her were **Steven J. Gillingham**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Benjamin C. Mizer**, Principal Deputy Assistant Attorney General, Civil Division, Department of Justice, Washington, D.C.

## O P I N I O N

<u>**HORN, J.**</u>

## FINDINGS OF FACT

    In the above-captioned case, plaintiff Dr. Mohd Refaei alleges that he was improperly terminated from his position as a medical resident at the William Beaumont Army Medical Center (WBAMC) without the due process required by an alleged contract between himself and the Army, Army regulations, applicable policies, and the United States Constitution. Dr. Refaei alleges that, on or about June 30, 2008, he was "appointed by the Secretary of Veterans Affairs to the Internal Medicine Residency Program at William Beaumont Army Medical Center (WBAMC) at a salary of $42,044 per year." Dr. Refaei alleges that he entered into this residency program pursuant to an agreement between the Department of Veterans Affairs (the VA), which, he alleges, paid residents' salaries, and the Department of the Army, which, he alleges, was served as his employer during his residency.[1] Dr. Refaei was a civilian during the entire course of his residency.

---

[1] Although Dr. Refaei alleges that the United States Army was his employer during his residency at WBAMC, the court notes that there is no evidence that Dr. Refaei was ever

_____

appointed to a position in the United States Army. Although plaintiff concedes that he was initially appointed to a position as a medical resident with the VA, he argues that after he was subsequently "transferred" by the VA to serve his residency at WBAMC, the Army became his employer because it "controlled Dr. Refaei's day-to-day activities while he served his residency as a civilian in an Army hospital, and controlled whether he was deemed to meet medical accreditation standards."

The United States Code defines an "employee" as a person who was:

> (1) appointed in the civil service by one of the following acting in an official capacity—
>
>> (A) the President;
>>
>> (B) a Member or Members of Congress, or the Congress;
>>
>> (C) a member of a uniformed service;
>>
>> (D) an individual who is an employee under this section;
>>
>> (E) the head of a Government controlled corporation; or
>>
>> (F) an adjutant general designated by the Secretary concerned under section 709(c) of title 32;
>
> (2) engaged in the performance of a Federal function under authority of law or an Executive act; and
>
> (3) subject to the supervision of an individual named by paragraph (1) of this subsection while engaged in the performance of the duties of his position.

5 U.S.C. § 2105(a) (2012). "It is obvious from the statutory language that there are three elements to the definition-appointment by an authorized federal employee or officer, performance of a federal function, and supervision by a federal employee or officer-and that they are cumulative. A person must satisfy each requirement." Skalafuris v. United States, 683 F.2d 383, 386 (Ct. Cl. 1982) (quoting Costner v. United States, 229 Ct. Cl. 87, 93, 665 F.2d 1016, 1020 (Ct. Cl. 1981)).

Plaintiff alleges, and the evidence discussed below, in particular plaintiff's Standard Form 50, demonstrates, that he was appointed by an authorized individual, the Secretary of the VA, to a position in the VA pursuant to the Secretary's authority under 38 U.S.C. § 7406 (2012). There is no evidence in the record, however, that he ever was appointed by an authorized individual to a position in the United States Army. Regardless of the degree of control the Army may have exercised over Dr. Refaei during his residency at WBAMC, he was not an "employee" of the Army absent such an appointment. See id. ("[A]n 'abundance of federal function and supervision will not make up for the lack of an

Plaintiff's Standard Form (SF) 50, which was provided by the defendant as an appendix to its motion to dismiss, has an effective date of July 1, 2008 and notes that plaintiff's position title was "PHYSICIAN (1ST YR RESIDENT)," that this was an "EXCEPTED APPOINTMENT," that plaintiff's position was part of the "Excepted Service," that the legal authority for plaintiff's appointment was 38 U.S.C. § 7406, that his employing department or agency was the "DEPARTMENT OF VETERANS AFFAIRS," and that his basic pay would be $42,044.00. (capitalization in original). The name and location of plaintiff's "Position's Organization" is listed as:

VA EL PASO HEALTHCARE SY

PATIENT CARE SVCS CHIEF OF STAFF

EL PASO      TX[.]

The "Remarks" portion of the SF 50 includes the following statements:

ASSIGNMENT:      GEN INTERNAL MED

APPOINTMENT AFFIDAVIT EXECUTED 07-01-2008.

THIS APPOINTMENT IS FOR DURATION OF THIS TRAINING UNLESS SOONER TERMINATED, AND IS SUBJECT TO PERIODIC REVIEW BY RESIDENT REVIEW BOARD.

On June 30, 2008, plaintiff signed and acknowledged receipt of a document titled "POLICY ON DUE PROCESS FOR PARTICIPANTS IN MILITARY GRADUATE MEDICAL EDUCATION PROGRAMS" (the Due Process Policy). Plaintiff attached a signed copy of the Due Process Policy to his complaint. The Due Process Policy describes its purpose as follows:

1. **PURPOSE.** This document updates established policy and provides general guidance to Army medical treatment facilities (MTF) engaged in graduate medical education (GME) for the development of institutional due process procedures related to remedial and adverse actions involving trainees in training programs. Each institution must develop specific policies and procedures in accordance with the Institutional Requirements of the Accreditation Council for Graduate Medical Education (ACGME) and compatible with local circumstances. This guidance provides minimum requirements that **must be incorporated** into the specific policies and procedures documents for each institution accredited to conduct GME.

_____

appointment.'" (quoting Costner v. United States, 229 Ct. Cl. at 94, 665 F.2d at 1019-20)). Based on the evidence in the record, therefore, plaintiff was an employee of the VA rather than the Army during his time at WBAMC.

(emphasis in original). The second paragraph of the Due Process Policy, titled "**INTRODUCTION**," summarizes the contents of the Due Process Policy, as follows:

> This section outlines the process of management for trainees who encounter academic, technical, and/or professional conduct problems. The procedures prescribed herein apply to program level remediation, probation, restriction of training, leave of absence, suspension of training, extension of training, and termination from training. These procedures present a sequence of corrective actions emphasizing due process, thorough documentation of all actions, and timeliness of the process.

(emphasis in original).

Paragraph 10 of the Due Process Policy states, in part:

> 10. **TERMINATION FROM TRAINING.** Termination is the most serious action that can be proposed by a Program Director. Termination will normally be imposed only after a period of formal probation, two-time nonselect for promotion, or after a single incident of gross negligence or willful misconduct. A recommendation for termination must be approved by a two-thirds vote of the GMEC [Graduate Medical Education Committee[2]] by secret ballot.

(emphasis in original).

Paragraph 14 of the Due Process Policy outlines the "**PROCESS FOR PROBATION AND TERMINATION**," which includes a requirement that the program director provide a trainee to be placed on probation or terminated from training with two written notices, the first when "adverse action is being considered" and the second "if the proposal for the adverse action will go forward." (emphasis in original). The first notice is to include the "specific reasons for the proposed action," and the second notice is to include the "specific reasons for the contemplated action."

Paragraph 15 of the Due Process Policy discusses a "**TRAINEE'S RIGHTS UNDER DUE PROCESS AND CONDUCT OF GMEC HEARINGS ON PROBATION OR TERMINATION**." (emphasis in original). Paragraph 15 includes the following:

---

[2] The Due Process Policy defines the Graduate Medical Education Committee as:

> The institutional committee composed of the DME/DIO [Director of Medical Education/Designated Institutional Official], Service DMEs (if appropriate), Program Directors and at least one trainee representative whose charter is to monitor and advise on all aspects of GME in the institution and make recommendations to the decision authority [i.e., the individual designated in institutional documents as having initial authority for probation or termination].

c. The trainee has the following rights in the proceedings:

(1) The right to waive the hearing.

(2) The right to hear the reasons for action as put forth by the Program Director.

(3) The right to review all documents before the committee.

(4) The right to secure a military legal assistance attorney or a civilian attorney at the trainee's expense. . . .

(5) The right to respond orally and/or in writing to the statements of the Program Director

(6) The right to request witnesses to speak on his/her behalf or to submit statements form those witnesses. This request will normally be honored, however, the hearing will not be unreasonably delayed in order to allow their appearance. . . .

(7) The right to submit statements or written documents in their own behalf and in support of his/her position, or other information to show why other disposition should not occur.

(8) The right to appeal a decision.

On July 9, 2008 plaintiff signed a document titled "WILLIAM BEAUMONT ARMY MEDICAL CENTER RESIDENT AGREEMENT GRADUATE MEDICAL EDUCATION" (the Resident Agreement).[3] (capitalization in original). On August 2, 2008, the document also was signed by Major Kent J. Dezee, "Internal Medicine Program Director." The Resident Agreement includes descriptions of various policies affecting resident physicians at WBAMC, such as resident responsibilities and benefits. Among the provisions of the Resident Agreement relevant to plaintiff's case is paragraph 3, titled "**Benefits**," which states, in part:

a. Fiscal Agencies: The training programs at William Beaumont Army Medical Center acquire residents through several different sources. These Fiscal Agencies provide the financial support and specific benefits for their respective group of respective group of residents. (Example, U.S. Army, Veterans Affairs, and Texas Tech University). Each of these agencies has it's [sic] own set of formal polices and contracts specific to employment with

---

[3] In his complaint, plaintiff alleged that the Resident Agreement was not currently in his possession. Defendant, however, attached a copy of the document signed by plaintiff to its motion to dismiss.

that entity. (Example, Army Regulations). This Resident Agreement highlights the various benefits provided to the residents. However, this agreement cannot supercede [sic] the specific policies of each agency.

(emphasis in original). Additionally, paragraph 4 of the Resident Agreement lists plaintiff's term of residency as "Internal Medicine Residency, 1 July 2008 – 30 June 2011." Finally, paragraph 8 of the Resident Agreement, titled "**Guarantee of Fair Procedures**," states, in full: "See your Due Process document for guidance." (emphasis in original). The referenced "Due Process document" appears to be the Due Process Policy described above.

Plaintiff alleges that, on or about August 3, 2011, WBAMC initiated action to terminate him from the residency program. According to plaintiff, the only reason given by WBAMC for its action in a "Notice of Recommended Termination" provided to Dr. Refaei was that, on "July 29, 2011, Plaintiff had responsibility for leaving a patient on the ward where he was hospitalized, rather than transferring him to the Intensive Care Unit."[4] Plaintiff refers to this incident as the "ward incident." According to plaintiff, "[t]he accusation was unfounded."

Plaintiff next alleges that a group that plaintiff refers to only as the "Committee" held a hearing on August 31, 2011 regarding the termination of his residency at WBAMC. Plaintiff alleges multiple irregularities occurred both before and during the August 31, 2011 hearing. Plaintiff alleges that the person "most knowledgeable about the ward incident," Dr. George Imuro, was unavailable to testify at the time of the hearing and that the WBAMC denied plaintiff's request to postpone the hearing until such time as Dr. Imuro would be available to testify in person. At the August 31, 2011 hearing, evidence against plaintiff was allegedly presented by a "Dr. Cole" regarding events other than the ward incident, which plaintiff alleges was the only item mentioned in the Notice of Recommended Termination. According to plaintiff, while he attempted to defend himself at the hearing, the doctor sitting behind him repeatedly interrupted plaintiff to contradict what he was saying. Plaintiff also alleges that there was no recording of the proceedings or, if there was, it is no longer available, and that various Committee members who accused plaintiff of misconduct remained in the room during deliberations and did not give plaintiff the opportunity to respond. Moreover, according to plaintiff, a "large stack of documents" was on a table during the hearing that plaintiff never had a chance to review, despite a written request from his attorney.

At the end of the hearing, the Committee unanimously recommended that the plaintiff be terminated. Now, before this court, plaintiff alleges that, in announcing the recommendation, the Chairman of the Committee, Dr. Stephen P. Hetz, "stated that the Committee had considered all of the uncharged misconduct which Dr. Cole had laid in front of it, and about which conduct Plaintiff had no advance notice, no opportunity to improve during the probationary period, and no opportunity to prepare a meaningful

---

[4] Neither party has provided the court with a copy of this "Notice of Recommended Termination."

reply." Also, according to plaintiff, the Committee's memorandum making its recommendation did not mention the ward incident, the only charge, according to plaintiff, that was actually contained in the Notice of Recommended Termination, except to say that it had reviewed Dr. Imuro's statement, which he had made in lieu of personally testifying. The Commanding General of WBAMC approved the recommendation for Plaintiff's termination, effective September 26, 2011. According to plaintiff, this was less than two months before he would have completed his residency. Plaintiff alleges that his annual salary was $47,528 at the time of this termination.

Plaintiff filed a complaint in the United States District Court for the Western District of Texas on June 18, 2013 in a case titled Refaei v. McHugh, No. 3:13-CV-00196, 2014 WL 11516372 (W.D. Tex. Aug. 20, 2014). Plaintiff's complaint in the District Court alleged multiple causes of action against the United States Army: violations of Title VII of the Civil Rights Act of 1964; violations of the Age Discrimination in Employment Act (ADEA) of 1967; breach of contract; intentional infliction of emotional distress; and defamation. See id. at *1. Plaintiff subsequently dropped his emotional distress and defamation claims, and the District Court ultimately dismissed plaintiff's breach of contract claim on the ground that it was preempted by Title VII, the ADEA, and the Civil Service Reform Act and granted summary judgment for the defendant with respect to the Title VII and ADEA claims. See id. at *1, *5. On appeal, the United States Court of Appeals for the Fifth Circuit affirmed the District Court's grant of summary judgement with respect to the Title VII and ADEA claims. See Refaei v. McHugh, 624 F. App'x 142, 147-48 (5th Cir. 2015). The Court of Appeals, however, held that the District Court lacked jurisdiction to decide plaintiff's breach of contract claim and, therefore, reversed the District Court's dismissal of the breach of contract claim and remanded with instructions that the claim be transferred to the United States Court of Federal Claims. See id. at 148-49.

Plaintiff filed his transfer complaint in this court on August 4, 2015. In his complaint in this court, plaintiff alleges multiple causes of action against defendant based on the circumstances surrounding his termination. First, plaintiff alleges that the Due Process Policy constitutes an express or, alternatively, an implied contract requiring that plaintiff would have the benefit of at least the minimum due process it outlined and that the Army breached this contract "by its multiple violations of policies" (plaintiff's breach of contract claim). Second, plaintiff alleges that the Army violated its own regulations concerning: notice to probationary employees; fair opportunity to demonstrate improvement; advance written notice of reasons for termination and deficiencies; a fair and meaningful opportunity to reply; and other unspecified due process before terminating plaintiff (plaintiff's due process claim). Third, Plaintiff alleges that his termination, allegedly made without proper notice or other due process, resulted in loss of property, in the form of salary, bonuses, and damage to his professional reputation, in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution (plaintiff's Fifth Amendment claim). As damages, plaintiff seeks "at least $2.5 million." Plaintiff alleges that this number represents the difference between the $187,000 per year that he had a "reasonable expectation" of earning over the next 25 years in private medical practice had he completed his residency and the $80,000 a year that he is "only able to earn" in his present circumstances employed as a general practitioner on an Indian reservation. Defendant has filed a motion to dismiss each of the causes of action alleged in plaintiff's

complaint for lack of subject matter jurisdiction under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC) (2016) or for failure to state a claim upon which relief may be granted under RCFC 12(b)(6), to which plaintiff has filed a response.[5]

## DISCUSSION

It is well established that "'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'" Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428, 434 (2011); see also Gonzalez v. Thaler, 132 S. Ct. 641, 648 (2012) ("When a requirement goes to subject-matter jurisdiction, courts are obligated to consider sua sponte issues that the parties have disclaimed or have not presented."); Hertz Corp. v. Friend, 559 U.S. 77, 94 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." (citing Arbaugh v. Y & H Corp., 546 U.S. at 514)); Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case." (citing Johannsen v. Pay Less Drug Stores N.W., Inc., 918 F.2d 160, 161 (Fed. Cir. 1990))); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). "Objections to a tribunal's jurisdiction can be raised at any time, even by a party that once conceded the tribunal's subject-matter jurisdiction over the controversy." Sebelius v. Auburn Reg'l Med. Ctr., 133 S. Ct. 817, 824 (2013); see also Arbaugh v. Y & H Corp., 546 U.S. at 506 ("The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment."); Cent. Pines Land Co., L.L.C. v. United States, 697 F.3d 1360, 1364 n.1 (Fed. Cir. 2012) ("An objection to a court's subject matter jurisdiction can be raised by any party or the

---

[5] Subsequently, plaintiff filed a motion to supplement his response to defendant's motion to dismiss. In this motion, plaintiff's attorney states that he had recently, and unexpectedly, discovered a document published by the United States Army War College in 1992 titled "THE FUTURE OF MILITARY GRADUATE MEDICAL EDUCATION" (capitalization in original), excerpts of which he attached to his motion to supplement. Plaintiff argues that the document "does not address the main questions in this case, but it does answer an important one: how long has WBAMC been operating under residency requirements accredited by ACGME?" According to plaintiff, the document shows that WBAMC has been operating under such requirements since the date the document was written, January 8, 1992. In a response to plaintiff's motion to supplement, defendant states that it takes no position on whether to grant defendant's motion, although it "believe[s] this supplementation will be futile, as it does not address the arguments [defendant] raised in [its] motion to dismiss." Because, as discussed below, the court does not find ACGME's accreditation requirements to be legally significant to the questions at issue, plaintiff's motion to supplement is denied.

court at any stage of litigation, including after trial and the entry of judgment." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506–07)); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506; Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); and Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998))); Pikulin v. United States, 97 Fed. Cl. 71, 76, appeal dismissed, 425 F. App'x 902 (Fed. Cir. 2011). In fact, "[s]ubject matter jurisdiction is an inquiry that this court must raise *sua sponte*, even where . . . neither party has raised this issue." Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir.) (citing Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481, 1485 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir.), cert. denied, 525 U.S. 826 (1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. granted in part sub. nom Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 546 U.S. 975 (2005), cert. dismissed as improvidently granted, 548 U.S. 124 (2006); see also Avid Identification Sys., Inc. v. Crystal Import Corp., 603 F.3d 967, 971 (Fed. Cir.) ("This court must always determine for itself whether it has jurisdiction to hear the case before it, even when the parties do not raise or contest the issue."), reh'g and reh'g en banc denied, 614 F.3d 1330 (Fed. Cir. 2010), cert. denied, 131 S. Ct. 909 (2011).

"Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir.) (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1 (1983)), reh'g denied (Fed. Cir. 1997); see also Klamath Tribe Claims Comm. v. United States, 97 Fed. Cl. 203, 208 (2011); Gonzalez-McCaulley Inv. Grp., Inc. v. United States, 93 Fed. Cl. 710, 713 (2010). A plaintiff need only state in the complaint "a short and plain statement of the grounds for the court's jurisdiction," and "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(1), (2) (2016); Fed. R. Civ. P. 8(a)(1), (2) (2016); see also Ashcroft v. Iqbal, 556 U.S. 662, 677–78 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–57, 570 (2007)). However, "[c]onclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." Bradley v. Chiron Corp., 136 F.3d 1317, 1322 (Fed. Cir. 1998); see also McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1363 n.9 (Fed. Cir. 2007) (Dyk, J., concurring in part, dissenting in part) (quoting C. Wright and A. Miller, Federal Practice and Procedure § 1286 (3d ed. 2004)).

The Tucker Act grants jurisdiction to this court as follows:

The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (2012). As interpreted by the United States Supreme Court, the Tucker Act waives sovereign immunity to allow jurisdiction over claims against the United

States (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. See United States v. Navajo Nation, 556 U.S. 287, 289–90 (2009); United States v. Mitchell, 463 U.S. 206, 216 (1983); see also Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 552 U.S. 1142 (2008); Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir. 1999).

"Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States . . . ." United States v. Mitchell, 463 U.S. at 216; see also United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003); Smith v. United States, 709 F.3d 1114, 1116 (Fed. Cir.), cert. denied, 134 S. Ct. 259 (2013); RadioShack Corp. v. United States, 566 F.3d 1358, 1360 (Fed. Cir. 2009); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d at 1343 ("[P]laintiff must . . . identify a substantive source of law that creates the right to recovery of money damages against the United States."); Golden v. United States, 118 Fed. Cl. 764, 768 (2014). In Ontario Power Generation, Inc. v. United States, the United States Court of Appeals for the Federal Circuit identified three types of monetary claims for which jurisdiction is lodged in the United States Court of Federal Claims. The court wrote:

> The underlying monetary claims are of three types. . . . First, claims alleging the existence of a contract between the plaintiff and the government fall within the Tucker Act's waiver. . . . Second, the Tucker Act's waiver encompasses claims where "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum." Eastport S.S. [Corp. v. United States, 178 Ct. Cl. 599, 605–06,] 372 F.2d [1002,] 1007-08 [(1967)] (describing illegal exaction claims as claims "in which 'the Government has the citizen's money in its pocket'" (quoting Clapp v. United States, 127 Ct. Cl. 505, 117 F. Supp. 576, 580 (1954)) . . . . Third, the Court of Federal Claims has jurisdiction over those claims where "money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury." Eastport S.S., 372 F.2d at 1007. Claims in this third category, where no payment has been made to the government, either directly or in effect, require that the "particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." Id.; see also [United States v. ]Testan, 424 U.S. [392,] 401-02 [1976] ("Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim-whether it be the Constitution, a statute, or a regulation-does not create a cause of action for money damages unless, as the Court of Claims has stated, that basis 'in itself . . . can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" (quoting Eastport S.S., 372 F.2d at 1009)). This category is

commonly referred to as claims brought under a "money-mandating" statute.

Ontario Power Generation, Inc. v. United States, 369 F.3d 1298, 1301 (Fed. Cir. 2004); see also Twp. of Saddle Brook v. United States, 104 Fed. Cl. 101, 106 (2012).

To prove that a statute or regulation is money-mandating, a plaintiff must demonstrate that an independent source of substantive law relied upon "'can fairly be interpreted as mandating compensation by the Federal Government.'" United States v. Navajo Nation, 556 U.S. at 290 (quoting United States v. Testan, 424 U.S. 392, 400 (1976)); see also United States v. White Mountain Apache Tribe, 537 U.S. at 472; United States v. Mitchell, 463 U.S. at 217; Blueport Co., LLC v. United States, 533 F.3d 1374, 1383 (Fed. Cir. 2008), cert. denied, 555 U.S. 1153 (2009). The source of law granting monetary relief must be distinct from the Tucker Act itself. See United States v. Navajo Nation, 556 U.S. at 290 (The Tucker Act does not create "substantive rights; [it is simply a] jurisdictional provision[] that operate[s] to waive sovereign immunity for claims premised on other sources of law (e.g., statutes or contracts).")." "'If the statute is not money-mandating, the Court of Federal Claims lacks jurisdiction, and the dismissal should be for lack of subject matter jurisdiction.'" Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1308 (Fed. Cir. 2008) (quoting Greenlee Cnty., Ariz. v. United States, 487 F.3d at 876); Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (The absence of a money-mandating source is "fatal to the court's jurisdiction under the Tucker Act."); Peoples v. United States, 87 Fed. Cl. 553, 565–66 (2009).

A motion to dismiss under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted "'is appropriate when the facts asserted by the claimant do not under the law entitle him [or her] to a remedy.'" Murdock v. United States, 103 Fed. Cl. 389, 394 (2012) (alterations in original) (quoting Perez v. United States, 156 F.3d 1366, 1370 (Fed. Cir. 1998)). In examining what must be pled in order to state a claim, under both RCFC 8(a)(2) and Rule (8)(a)(2) of the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2); Fed. R. Civ. P. 8(a)(2); see also Bell Atl. Corp. v. Twombly, 550 U.S. at 555; TrinCo Inv. Co. v. United States, 722 F.3d 1375, 1380 (Fed. Cir. 2013) ("To avoid dismissal under RFCF [RCFC] 12(b)(6), a party need only plead 'facts to state a claim to relief that is plausible on its face,' with facts sufficient to nudge 'claims across the line from conceivable to plausible.'" (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555)). The United States Supreme Court in Twombly stated:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss [for failure to state a claim] does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see Papasan v. Allain, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d

ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), <u>see</u>, <u>e.g.</u>, <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 508 n.1 (2002) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely") . . . . [W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.

<u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555-56, 570 (footnote and other citations omitted; brackets and omissions in original); <u>see also</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678 (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555-57, 570); <u>Totes-Isotoner Corp. v. United States</u>, 594 F.3d 1346, 1354-55 (Fed. Cir.), <u>cert.</u> denied, 562 U.S. 830 (2010); <u>Bank of Guam v. United States</u>, 578 F.3d 1318, 1326 (Fed. Cir.) ("In order to avoid dismissal for failure to state a claim, the complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 557)), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2009), <u>cert.</u> <u>denied</u>, 561 U.S. 1006 (2010); <u>Cambridge v. United States</u>, 558 F.3d 1331, 1335 (Fed. Cir. 2009) ("[A] plaintiff must plead factual allegations that support a facially 'plausible' claim to relief in order to avoid dismissal for failure to state a claim." (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 570)); <u>Cary v. United States</u>, 552 F.3d 1373, 1376 (Fed. Cir.) ("The factual allegations must be enough to raise a right to relief above the speculative level. This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face." (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555, 570)), <u>reh'g denied</u> (Fed. Cir.), <u>cert.</u> <u>denied</u>, 557 U.S. 937 (2009); <u>Peninsula Grp. Capital Corp. v. United States</u>, 93 Fed. Cl. 720, 726-27 (2010), <u>appeal dismissed</u>, 454 F. App'x 900 (2011); <u>Legal Aid Soc'y of New York v. United States</u>, 92 Fed. Cl. 285, 292, 298, 298 n.14 (2010); <u>Hall v. Bed Bath & Beyond, Inc.</u>, 705 F.3d 1357, 1362 (Fed. Cir. 2013) ("the factual allegations must 'raise a right to relief above the speculative level' and must cross 'the line from conceivable to plausible.'" (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555)).

When deciding whether a plaintiff has failed to state a claim upon which relief can be granted, the court assumes that the undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. <u>See</u> <u>Cambridge v. United States</u>, 558 F.3d at 1335 (citing <u>Papasan v. Allain</u>, 478 U.S. 265, 283 (1986)); <u>Cary v. United States</u>, 552 F.3d at 1376 (citing <u>Gould, Inc. v. United States</u>, 935 F.2d 1271, 1274 (Fed. Cir. 1991)); <u>Anaheim Gardens v. United States</u>, 444 F.3d 1309, 1315 (Fed. Cir.), <u>reh'g denied</u> (Fed. Cir. 2006); <u>Boyle v. United States</u>, 200 F.3d 1369, 1372 (Fed. Cir. 2000); <u>Perez v. United States</u>, 156 F.3d at 1370; <u>Henke v. United States</u>, 60 F.3d 795, 797 (Fed. Cir. 1995). If a defendant or the court challenges jurisdiction or a plaintiff's claim for relief, however, the plaintiff cannot rely merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. <u>See</u> <u>McNutt v. Gen. Motors Acceptance Corp. of Ind.</u>, 298 U.S. 178, 189 (1936); <u>see</u> <u>also</u>

Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988). Therefore, although the court must assume that the undisputed facts alleged in the complaint are true for the purposes of the motion to dismiss and draws all reasonable inferences in the plaintiffs' favor, the facts alleged in the complaint must be plausible and not merely naked assertions devoid of a factual basis. See Ashcroft v. Iqbal, 556 U.S. at 678; see also McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1363 n.9 (Fed. Cir. 2007) (Dyk, J., concurring in part, dissenting in part) (quoting C. Wright and A. Miller, Federal Practice and Procedure § 1286 (3d ed. 2004)) (mere allegations of law and conclusions of fact are insufficient to support a claim).

In support of his breach of contract claim, plaintiff alleges that the Resident Agreement he signed on July 9, 2008 constituted "an express or alternatively implied contract" between the plaintiff and the Army that included a promise that plaintiff "would have the benefit of at least the minimum due process requirements mandated by ACGME." According to plaintiff, the Resident Agreement incorporated the Due Process Policy by reference. Plaintiff alleges that the Army breached this alleged contract through "multiple violations" of the policies listed in the Due Process Policy.

Defendant moves to dismiss plaintiff's breach of contract claim because plaintiff served as a medical resident pursuant to an appointment by the VA, a federal agency, which, according to defendant, means that plaintiff could not have served pursuant to a contract. In support of this argument, defendant cites the general propositions of law that a party's "relationship with the Government cannot be simultaneously governed by both an appointment and a contract," Collier v. United States, 56 Fed. Cl. 354, 356 (2003), and that "absent specific legislation, federal employees derive the benefits and emoluments of their positions from appointment rather than from any contractual or quasi-contractual relationship with the government," Chu v. United States, 773 F.2d 1226, 1229 (Fed. Cir. 1985). As evidence that plaintiff was a government appointee, defendant notes that plaintiff's SF 50 states that he was appointed to his position with the VA. Plaintiff also notes that plaintiff states in his complaint that he was appointed to his position by the Secretary of the Department of Veterans Affairs and that the statute establishing the Department of Veterans Affairs residency program, 38 USC 7406(c), does not provide the Secretary of the VA authority to contract with residents directly. Alternatively, defendant argues that, even assuming that plaintiff did serve pursuant to a contract, the court lacks jurisdiction to hear plaintiff's claim for breach because neither of the documents allegedly comprising plaintiff's alleged contract, the Due Process Policy and the Resident Agreement, can be interpreted as mandating money damages for the alleged breach.

Plaintiff does not appear to challenge defendant's contention that he was appointed to his residency position. Instead, plaintiff characterizes defendant's position as being "based on the general rule that federal employees derive their rights by appointment and not by contract," but argues that his case "presents a very different and unusual situation." Specifically, plaintiff argues that the body that allegedly has "plenary accreditation authority over all medical residency programs," including WBAMC's residency program, the Accreditation Council for Graduate Medical Education (the ACGME), "absolutely required" WBAMC to have express written contracts incorporating

due process policies with its medical residents. According to plaintiff, because WBAMC was required by ACGME to provide such a contract with Dr. Refaei, "Dr. Refaei's contract rights cannot be abrogated by any talismanic effect of the nomenclature applied to his status."

As defendant correctly notes, the United States Court of Appeals for the Federal Circuit has held that "there is a 'well-established principle that, absent specific legislation, federal employees derive the benefits and emoluments of their positions from appointment rather than from any contractual or quasi-contractual relationship with the government.'" Hamlet v. United States, 63 F.3d 1097, 1101 (Fed. Cir.) (quoting Chu v. United States, 773 F.2d at 1229), reh'g denied and en banc suggestion declined (Fed. Cir. 1995), cert. denied, 517 U.S. 1155 (1996); see also Doe v. United States, 513 F.3d 1348, 1355 (Fed. Cir. 2008) ("To the extent that the appellants seek to enforce their employment rights under the FLSA or Title 5 through a breach of contract claim, the Court of Federal Claims correctly dismissed that claim for lack of subject matter jurisdiction because, as federal employees, the appellants 'derive the benefits and emoluments of their positions from appointment rather than from any contractual or quasi-contractual relationship with the government.'" (quoting Chu v. United States, 773 F.2d at 1229)); Adams v. United States, 391 F.3d 1212, 1221 (Fed. Cir. 2004) ("Like all federal employees, Appellants served by appointment. The terms of their employment and compensation, consequently, were governed exclusively by statute, not contract."), cert. denied, 546 U.S. 811 (2005); Collier v. United States, 379 F.3d at 1332 ("As an appointed employee, Mr. Collier did not have an employment contract with the government, and did not acquire such a contract through his job description or performance plan."); Kania v. United States, 227 Ct. Cl. 458, 464–65, 650 F.2d 264, 268 ("Thus it has long been held that the rights of civilian and military public employees against the government do not turn on contract doctrines but are matters of legal status even where compacts are made."), cert. denied, 454 U.S. 895 (1981).

Likewise, judges of this court have frequently indicated that, "it is presumed that 'absent specific legislation, federal employees derive the benefits and emoluments of their positions from appointment rather than from any contractual or quasi-contractual relationship with the government.'" Charnetski v. United States, 111 Fed. Cl. 185, 188 (2013) (quoting Chu v. United States, 773 F.2d at 1229); see also Piper v. United States, 90 Fed. Cl. 498, 503 (2009), aff'd, 374 F. App'x 957 (Fed. Cir. 2010), cert. denied, 131 S. Ct. 936 (2011); Anderson v. United States, 64 Fed. Cl. 759, 762 (2005) ("If the plaintiffs are appointed employees, with no contractual aspects to their employment relationship, their case must be dismissed for lack of subject matter jurisdiction."); Calvin v. United States, 63 Fed. Cl. 468, 472 (2005) ("In other words, there is a 'presumption that federal employees hold their positions pursuant to appointment[ ] rather than by contract.'" (quoting Collier v. United States, 56 Fed. Cl. 354, 357 (2003), aff'd, 379 F.3d 1330 (Fed. Cir. 2004))) (alteration in Calvin v. United States); Berry v. United States, 27 Fed. Cl. 96, 100 (1992) ("The contract liability enforceable under the Tucker Act does not extend to every agreement, understanding, or compact entered into by the Government. It is well established that the rights of civilian and military public employees against the Government do not turn on contract doctrines, but are matters of legal status.") (citations omitted); Darden v. United States, 18 Cl. Ct. 855, 859 (1989) (finding that the most that

can be said about plaintiff's job description as a Grade 5 personnel clerk "is that plaintiff was apprised of her forthcoming responsibilities and the salary to which she was entitled for the performance of those duties. It may very well have created certain procedural rights, but under no circumstance may it be viewed as giving rise to a contractual relationship sufficient to create jurisdiction under the Tucker Act.").

The Federal Circuit summarized the status of a federal employee who holds an appointment as follows:

> federal workers serve by appointment, and their rights are therefore a matter of legal status even where compacts are made. In other words, their entitlement to pay and benefits must be determined by reference to the statutes and regulations governing [compensation], rather than to ordinary contract principles. Though a distinction between appointment and contact may sound dissonant in a regime accustomed to the principle that the employment relationship has its ultimate basis in contract, the distinction nevertheless prevails in government service. Applying these doctrines, courts have consistently refused to give effect to government-fostered expectations that, had they arisen in the private sector, might well have formed the basis for a contract or an estoppel. These cases have involved, _inter alia_, promises of appointment to a particular grade or step level, promises of promotion upon satisfaction of certain conditions, promises of extra compensation in exchange for extra services, and promises of other employment benefits.

Adams v. United States, 391 F.3d at 1221 (quoting Kizas v. Webster, 707 F.2d 524, 535 (D.C. Cir. 1983), cert. denied, 464 U.S. 1042 (1984)) (alteration in Adams v. United States).

A federal employee's "'relationship with the Government cannot be simultaneously governed by both an appointment and a contract.'" Charnetski v. United States, 111 Fed. Cl. at 188 (quoting Collier v. United States, 56 Fed. Cl. at 356); see also Piper v. United States, 90 Fed. Cl. at 503; Calvin v. United States, 63 Fed. Cl. at 472 ("While the Supreme Court has not explicitly held that employment by appointment and by contract are mutually exclusive, its reasoning implies such a principle, and courts have interpreted [Army and Air Force Exchange Serv. v.] Sheehan[, 456 U.S. 728 (1982)] and like precedents to require mutual exclusivity"). In Anderson v. United States, plaintiffs argued "that at least some aspects of their employment are governed by contract, and they assert that they _can_ simultaneously be party to both types of relationships." Anderson v. United States, 64 Fed Cl. at 762. (emphasis in original). The Anderson court, however, rejected this argument, finding that "[t]his proposition has been repeatedly rejected both by the Federal Circuit and the Court of Federal Claims." Anderson v. United States, 64 Fed. Cl. at 762–63. Ultimately, the Anderson court held, therefore, that "[t]he law is clear on this point: the plaintiffs cannot be both government employees and contractual employees; the two are mutually exclusive." Anderson v. United States, 64 Fed. Cl. at 762–63.

Moreover, "a presumption exists that federal employees serve by appointment, not by contract." Anderson v. United States, 64 Fed. Cl. at 762; see also Chu v. United States, 773 F.2d at 1229 ("[A]bsent specific legislation, federal employees derive the benefits and emoluments of their positions from appointment rather than from any contractual or quasi-contractual relationship with the government."); Calvin v. United States, 63 Fed. Cl. at 472 ("In other words, there is a 'presumption that federal employees hold their positions pursuant to appointment[ ] rather than by contract.'" (quoting Collier v. United States, 56 Fed. Cl. at 357)) (alteration in Calvin v. United States). Therefore, if plaintiff's claim is based on a breach of contract theory and his "employment was by 'appointment,' a breach of contract action against the government would be precluded." Hamlet v. United States, 63 F.3d at 1101 (citations omitted); see also Piper v. United States, 90 Fed. Cl. at 503; Calvin v. United States, 63 Fed. Cl. at 473.

Although a contract between the government and an individual employee is theoretically possible, the agreement between the parties must be specifically spelled out as a contract by a government person having authority to enter into a contract. See Kania v. United States, 227 Ct. Cl. at 465, 650 F.2d at 268; see also United States v. Hopkins, 427 U.S. 123, 128–30 (1976); Walton v. United States, 213 Ct. Cl. 755, 756 (1977). As a general proposition:

> [T]he law requires that a Government agent who purports to enter into or ratify a contractual agreement that is to bind the United States have actual authority to do so. See Trauma Serv. Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997). The corollary is that any party entering into an agreement with the Government accepts the risk of correctly ascertaining the authority of the agents who purport to act for the Government . . . .

Monarch Assurance P.L.C. v. United States, 244 F.3d 1356, 1360 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001).

When determining whether a government employee is serving by contract or appointment, the court looks to the relevant statutory language and implementing regulations, as well as to the hiring documents. See Hamlet v. United States, 63 F.3d at 1101; Charnetski v. United States, 111 Fed. Cl. at 188; Piper v. United States, 90 Fed. Cl. at 503; Calvin v. United States, 63 Fed. Cl. at 472. The statute which grants the Secretary of the VA the power to establish medical residencies, and which plaintiff's SF 50 states was the legal authority for his hiring, is 38 U.S.C. § 7406. Section 7406 explicitly grants to the Secretary of the VA the power to appoint residents, stating: "The Secretary [of the VA] may establish residencies and internships. The Secretary may appoint qualified persons to such positions without regard to civil service or classification laws, rules, or regulations." 38 U.S.C. § 7406(a)(1) (emphasis added). Although the statute grants the Secretary of the VA the power to contract with "hospitals, medical schools, or medical installations having hospital facilities and participating with the Department in the training of interns or residents," 38 U.S.C. § 7406(c)(1), there is no provision in that statute empowering the Secretary to enter into individual contracts with medical residents.

Considering plaintiff's hiring documents, plaintiff's SF 50 states that plaintiff's hiring was an "EXCEPTED APPOINTMENT" and that "THIS APPOINTMENT IS FOR DURATION OF THIS TRAINING UNLESS SOONER TERMINATED." (capitalization in original). Further, plaintiff's SF 50 states that an "APPOINTMENT AFFIDAVIT" had been "EXECUTED 07-01-2008," which is the day after plaintiff states that he was "appointed" to his position in his complaint. (capitalization in original). Therefore, plaintiff's hiring documents unambiguously indicate that plaintiff's employment was based on appointment, rather than on contract. See Calvin v. United States, 63 Fed. Cl. at 473 (holding that plaintiffs were appointees and that their claims for breach of contract were "precluded" because plaintiffs had executed SF 50s and "Appointment Affidavits," despite the fact that the relevant statute allowed defendant the option of hiring of by contract).

Instead of contesting the evidence of his appointment status offered by defendant, plaintiff argues that his relationship with the government must have included an express contract because "that arrangement is absolutely required by ACGME and backed up by its enforcement mechanism." In particular, plaintiff argues that ACGME has had, since July 1, 1982, mandatory requirements on Graduate Medical Education programs like the one he attended at WBAMC, including a requirement that institutions provide certain due process procedures. Plaintiff attaches to his response to defendant's motion to dismiss what he purports to be the ACGME's requirements for accreditation, which is part of a document titled "1990-19891 [sic] DIRECTORY OF GRADUATE MEDICAL EDUCATION PROGRAMS ACCREDITED BY THE ACCREDITATION COUNCIL FOR GRADUATE MEDICAL EDUCATION." Included in the portion of this document discussing "**General Requirements**" for graduate medical education programs, is a section on due process, which states, in relevant part:

> 5.1.6 *Due Process*: There must be institutional procedures which provide for due process for all parties potentially involved when actions are contemplated which could result in dismissal or could significantly threaten a resident's intended career development or when there are grievances against a program or institution. . . . The details must be written and made known to the residents, program directors, and adhered to by all programs sponsored by the institution. There must be an equitable and satisfactory mechanism, involving the participation of the medical staff, for the redress of grievances. Although final responsibility rests with the institution's governing body, the latter should rely upon the determinations of the medical staff in professional and educational matters.

A second provision "urges" that institutions make residents aware of these due process rights, stating, in relevant part:

> 5.3 *Resident Agreement*: The ACGME urges that programs provide residents with a written description of the educational experience to be provided including the nature of assignments to other programs or institutions. In addition, ACGME urges that each resident be offered for acceptance a written agreement encompassing the following:

* * *

5.3.6 Guarantee of Due Process.

(emphasis added). Plaintiff alleges that the Army "recognized ACGME's authority" when it issued Army Regulation 351-3, paragraph 6-6, which requires that "[a]ll trainees in GME must be afforded due process as prescribed by policy issued by TSG [the Surgeon General] and as outlined by the ACGME institutional requirements." According to plaintiff, Army Regulation 351-3 was applicable to medical residents at WBAMC because it was an Army facility.

Even assuming that the two ACGME provisions cited by plaintiff were applicable to the defendant, they did not require, or even suggest, that the government enter into a separate contractual employment relationship with a medical resident who was attending its graduate medical education programs. Instead, by its own terms, the ACGME document requires institutions to promulgate a due process policy, applicable to all individuals in the program, which plaintiff does not allege defendant failed to do, and "urges" institutions to offer written agreements "encompassing" a "Guarantee of Due Process," not an employment contract. Further, defendant cites to no case law which holds that documents outlining constitutionally derived due process guarantees are the equivalent of individual employment contracts, or that the requirements of private organizations, such as ACGME, can result in the government having entered into contractual, rather than the appointment-based, relationships the government traditionally has with its employees. Simply put, there is a missing step in plaintiff's logic. While a private organization may, as plaintiff argues regarding ACGME, hold a "power [that] must be respected even by the Government" regarding accreditation, it does not follow that such power, without more, causes an express or implied contract to arise between the government and one of its employees. The portion of Army Regulation 351-3 cited by plaintiff indicates that the Army should afford certain due process rights to trainees in its graduate medical education programs, but it says nothing about whether those trainees should be employed based on appointment or contract. The purported existence of the ACGME's requirements on the Army, therefore, could not and did not alter plaintiff's appointee status.

Plaintiff has failed to present any evidence that rebuts the presumption that, as a federal employee, Dr. Refaei was employed by appointment, rather than by contract during his residency. Moreover, there is strong evidence in the record, in the form of Dr. Refaei's SF 50, that, in fact, he was appointed to his position. Because plaintiff's employment at WBAMC was by appointment and not by contract, plaintiff's claim for breach of contract must fail for lack of jurisdiction.[6] With respect to plaintiff's breach of contract claim, defendant's motion to dismiss is granted.

---

[6] In what appears to be a separate argument, plaintiff also alleges that the combination of 38 U.S.C. 7406, Army Regulation 351-3 § 6-6, and the requirements of the ACGME's "DIRECTORY OF GRADUATE MEDICAL EDUCATION PROGRAMS" document, form a "classic network . . . which create the framework of an express contract within the

In support of his second alleged cause of action, plaintiff's due process claim, plaintiff alleges that the Army violated its own regulations and policies concerning notice to probationary employees, a fair opportunity to demonstrate improvement, advance written notice of reasons for termination and deficiencies, and a fair and meaningful opportunity to reply, as well as other due process grounds, when it terminated plaintiff from the residency program. In his complaint, plaintiff fails to specify the regulations and policies he believes defendant violated, but in his response to defendant's motion to dismiss, plaintiff argues that that defendant's actions violated WBAMC's Due Process Policy, which, he alleges, was "mandated by" Army Regulation 351-3, paragraph 6-6.

---

meaning of *United States v. Navajo Nation ('Navajo I')*, 537 U.S. 488, 504-06 (2003); and *United States v. Navajo Nation ('Navajo II')*, 556 U.S. 287, 129 S.Ct. 1547, 1554-55 (2009)." Plaintiff's argument fundamentally misunderstands <u>United Sates v. Navajo Nation</u>, 537 U.S. 488 (2003) (<u>Navajo Nation I</u>) and <u>United States v. Navajo Nation</u>, 556 U.S. 287 (2009) (<u>Navajo Nation II</u>). The holding articulated in these two opinions regarding the "network theory" of jurisdiction was explained by a Judge of the United States Court of Federal Claims, as follows:

> According to the "the network theory" of jurisdiction under the Tucker Act and Indian Tucker Act, a meshwork of statutes and regulations may, under some circumstances, substitute for a clear money-mandating statute. *See United States v. Navajo Nation* ("*Navajo Nation I*"), 537 U.S. 488, 504–06, 123 S.Ct. 1079, 155 L.Ed.2d 60 (2003) (explaining that a network of statutes and regulations can satisfy this court's Indian Tucker Act jurisdiction when the "network" establishes specific rights and duties that go beyond a general trust relationship); *Samish Indian Nation v. United States,* 82 Fed.Cl. 54, 61–66 (2008) (recounting the history of the network theory and explaining that a network of statutes may satisfy this court's jurisdictional requirement of a money-mandating source when the network establishes a fiduciary relationship between the government and an Indian tribe). However, *Navajo Nation I* foreclosed the application of this theory in most cases, by requiring that a plaintiff identify "*specific* rights-creating or duty-imposing statutory or regulatory prescriptions" in place of a clear money-mandating statute. 537 U.S. at 506, 123 S.Ct. 1079, 155 L.Ed.2d 60 (emphasis added); *see United States v. Navajo Nation* ("*Navajo Nation II* "), [556] U.S. [287], 129 S.Ct. 1547, 1554–55, 173 L.Ed.2d 429 (2009) (explaining that *Navajo Nation I* foreclosed application of the network theory where the statutes comprising the network only created an implied duty).

<u>Rosales v. United States</u>, 89 Fed. Cl. 565, 574 n. 9 (2009) (emphasis in original). Thus, while, under the "network theory" of <u>Navajo Nation I</u> and <u>Navajo Nation II</u>, a group of regulations and statutes can, in limited instances, substitute for a money-mandating statute, the theory cannot, as plaintiff argues, transform a group of non-contractual documents into an "express contract" with the government.

Plaintiff also appears to allege that his termination violated the due process procedures required by Army Regulation 40-68.

Defendant argues that the court lacks jurisdiction to hear plaintiff's due process claim on two grounds. First, defendant argues that the Civil Service Reform Act (CSRA) precludes defendant from seeking judicial review of his termination. According to defendant, medical residents such as Dr. Refaei are excluded from the protections of the CSRA, and, under United States v. Fausto, 484 U.S. 439 (1988), when the CSRA excludes a certain class of employees from its coverage, those employees are precluded from seeking judicial review for personnel actions covered by the CSRA, such as terminations. Second, defendant argues that the court also lacks jurisdiction to hear plaintiff's due process claim because plaintiff has failed to cite a money-mandating source of law in support of his claim. According to defendant, the statutes and regulatory provisions cited by plaintiff in his complaint as sources of jurisdiction, 38 U.S.C. § 7406, Army Regulation 351-3, and Army Regulation 40-68, are not money mandating.[7]

Plaintiff fails to specifically respond to defendant's CSRA argument, but instead asserts that the court should grant him his requested relief because "[h]e has no remedy under the personnel statutes," apparently referencing the CSRA. In response to defendant's motion to dismiss, plaintiff also argues that two of the three statutes and regulations he cites as sources of jurisdiction in his complaint, 38 U.S.C. § 7406 and Army

---

[7] Initially, the court notes that, in its motion to dismiss, defendant incorrectly stated that "[w]hen a plaintiff fails to identify a money-mandating provision, the Court should dismiss his complaint for failure to state a claim upon which relief may be granted," rather than for lack of jurisdiction. In support of this argument, defendant cited Black v. United States, 56 Fed. Cl. 19, 24 (2003), which, in turn, cited Gollehon Farming v. United States, 207 F.3d 1373, 1379 (Fed. Cir. 2000). In Gollehon Farming, the United States Court of Appeals for the Federal Circuit did, as defendant argues, hold that, in cases in which a plaintiff fails to identify a money-mandating provision of an applicable statute, "the appropriate disposition is a dismissal for failure to state a claim." Gollehon Farming v. United States, 207 F.3d at 1379. This holding, however, was subsequently, explicitly overruled by the Federal Circuit in Fisher v. United States, 402 F.3d 1167 (Fed. Cir. 2005). See id. at 1173 ("Gollehon is thus overruled."). In place of the Gollehon Farming rule, the Federal Circuit held in Fisher that, if a trial court determines that the source of law cited by plaintiff in support of jurisdiction "as alleged and pleaded is not money-mandating, the court shall so declare, and shall dismiss the cause for lack of jurisdiction, a Rule 12(b)(1) dismissal—the absence of a money-mandating source being fatal to the court's jurisdiction under the Tucker Act." Id. Defendant appears, at least partially, to have recognized its error in its supplemental brief, stating that "**Army Regulation 351-1 Does Not Provide This Court With Jurisdiction To Entertain Mr. Refaei's Complaint**." (emphasis in original). The court will treat the portion of defendant's motion to dismiss relating to plaintiff's failure to cite a money-mandating source of law as if it were one for lack of subject matter jurisdiction under RCFC 12(b)(1).

Regulation 351-3, are money-mandating, although he fails to discuss the third source of jurisdiction listed in his complaint, Army Regulation 40-68. Plaintiff analogizes his case to military promotion, discharge, and disability retirement cases in which this court has found statutes involving "appointment to a particular rank or to the military" to be money-mandating and military regulations to provide a substantive cause of action. With little explanation, plaintiff also argues that the Back Pay Act, 5 U.S.C. § 5596 (2012), "is an appropriate, and alternate, authority to remedy [defendant's] unjustified personnel action."

The court turns first to defendant's argument that the CSRA deprives this court of jurisdiction to hear plaintiff's due process claim. In 1978, Congress passed the CSRA, Pub.L. No. 95–454, 92 Stat. 1138 (1978) (codified at 5 U.S.C. § 7701), which created the Merit Systems Protection Board (MSPB), and granted the MSPB the exclusive authority to adjudicate certain claims raised by federal employees which arise out of certain adverse personnel actions. 5 U.S.C. §§ 7512–7513 (2012). The CSRA "comprehensively overhauled the civil service system." United States v. Fausto, 484 U.S. at 443 (quoting Lindahl v. Office of Pers. Mgmt., 470 U.S. 768, 773–73, (1985)). "A leading purpose of the CSRA was to replace the haphazard arrangements for administrative and judicial review of personnel action, part of the 'outdated patchwork of statutes and rules built up over almost a century' that was the civil service system." Id. at 444, (quoting S. Rep. No. 95–969, at 3 (1978), 1978 U.S.C.C.A.N. 2723).

"The law is clear that, because the CSRA gives the MSPB and the Federal Circuit exclusive jurisdiction over certain federal personnel matters, it 'does not envision any review by the [Court of Federal Claims]'" for those same claims. Gallo v. United States, 76 Fed. Cl. 593, 600 (2007) (alteration in original) (quoting Bodine v. United States, 14 Cl. Ct. 661, 663 (1988) and citing Sacco v. United States, 63 Fed. Cl. 424, 428 (2004)), aff'd, 529 F.3d 1345 (Fed. Cir. 2008); see also Worthington v. United States, 168 F.3d 24, 26 (Fed. Cir. 1999) ("This court has noted that Fausto deprives the Court of Federal Claims of jurisdiction over personnel actions covered by the CSRA." (citing Romero v. United States, 38 F.3d 1204, 1211 (Fed. Cir. 1994))). "The CSRA, by its terms, however, does not encompass every adverse personnel action against a federal employee." Worthington v. United States, 168 F.3d at 26 (citing Romero v. United States, 38 F.3d at 1211). "The question then becomes whether the CSRA 'covers' [plaintiff's] action." Id.; see also Bosco v. United States, 931 F.2d 879, 883 (Fed. Cir.1991) ("The Supreme Court did not rule that the CSRA provided the only means of judicial review of any actions affecting federal employees, but rather that it was the only means of review as to the types of adverse personnel action specifically covered by the CSRA . . . ." (emphasis in original)). The United States Court of Appeals for the Federal Circuit has summarized the coverage of the CSRA as follows:

> The CSRA provides employees with procedural protections with respect to three general types of personnel actions: Chapter 23 forbids "prohibited personnel practices," such as discrimination, coercion of political activity, nepotism, and reprisal against "whistleblowers," 5 U.S.C. § 2302 (1988); Chapter 43 covers removals and reductions in grade and pay based on unacceptable performance, 5 U.S.C. § 4303 (1988); and Chapter 75 covers "adverse personnel actions"—removal, suspension, furlough, reduction in

grade and pay—taken to "promote the efficiency of the service" (i.e., involving employee misconduct). 5 U.S.C. §§ 7503, 7513 (1988). *See Fausto,* 484 U.S. at 445–47, 108 S.Ct. at 672–73.

Bosco v. United States, 931 F.2d at 883. "[I]n determining whether the MSPB possesses jurisdiction over a particular type of claim, thus depriving the Court of Federal Claims of jurisdiction, the court must engage in a general, rather than case specific, analysis." Gallo v. United States, 76 Fed. Cl. at 601.

In the present case, plaintiff seeks as damages the money he would have earned but for the termination of his residency, which, he alleges was done in violation of the guarantees of due process guarantees and applicable regulations. Plaintiff, therefore, challenges his removal from his appointed position. As noted above, there are two provisions of the CSRA that cover removal of federal employees, Subchapter II of Chapter 75, which covers removals taken to "promote the efficiency of the service," 5 U.S.C. § 7513 (2012), and Chapter 43, which covers removals "for unacceptable performance," 5 U.S.C. § 4303 (2012). Thus, "under *United States v. Fausto,* 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988), only the Merit Systems Protection Board, and not the Court of Federal Claims, is authorized to review removals of federal employees." Read v. United States, 254 F.3d 1064, 1066 (Fed. Cir. 2001); see also Khan v. United States, 201 F.3d 1375, 1381 (Fed. Cir. 2000) (holding that plaintiff's involuntary retirement claim was "*of the type* envisioned by the CSRA" (emphasis in original) (citing 5 U.S.C. § 7512 (1994) and Fisher v. United States Postal Serv., 68 M.S.P.R. 70 (1995)); LeBlanc v. United States, 50 F.3d 1025, 1029 (Fed. Cir.1995) (noting that, under the CSRA, the right to appeal to the MSPB "extends to all qualifying employees who are removed based on unacceptable performance or for the efficiency of the service" (citing 5 U.S.C. §§ 4303(e), 7512–7513)). Plaintiff's due process claim, therefore, is of a type that can be characterized as covered by the CSRA, and, therefore, this court lacks jurisdiction to hear it.

Plaintiff argues that the court should grant him his requested relief because "[h]e has no remedy under the personnel statutes," apparently referencing the CSRA. Plaintiff appears to be correct in his belief that he lacks a remedy under the CSRA. As noted above, there are two provisions of the CSRA that cover removal of Federal Employees, Subchapter II of Chapter 75 and Chapter 43. Appeal to the MSPB for removal based on Subchapter II of Chapter 75 of the CSRA "is not available to an employee 'who holds a position within the Veterans Health Administration which has been excluded from the competitive service by or under a provision of title 38, unless such employee was appointed to such position under section 7401(3) of such title.'" Khan v. United States, 201 F.3d at 1380 (quoting 5 U.S.C. § 7511(b)(10) (1994)). Plaintiff's SF 50 states that his position was part of the excepted service, rather than the competitive service, and that he was hired pursuant to 38 U.S.C § 7406, a provision of Title 38 of the United States Code, which authorizes the Secretary of the VA to establish and appoint qualified individuals to medical residencies and internships. See 38 U.S.C. § 7406(a)(1). Plaintiff, thus, "was excluded from the competitive service under a provision of title 38 and is therefore not entitled to appeal to the [Merit Systems Protection] Board under chapter 75 of title 5." Khan v. United States, 201 F.3d at 1380-81 (holding that a doctor appointed to the

Veterans Health Administration position under 38 U.S.C. 7401(1) (1994) and whose position was excluded from the competitive service was not entitled to appeal to the MSPB under Chapter 75).

Similarly, appeals to the MSPB under Chapter 43, are limited to federal employees who are: "(1) a preference eligible; (2) in the competitive service; or (3) in the excepted service and covered by subchapter II of chapter 75." 5 U.S.C. § 4303(e) (2012). Appointments, such as plaintiff's, made under 38 U.S.C § 7406 are not preference eligible. See Scarnati v. Dep't Of Veterans Affairs, 344 F.3d 1246, 1248 (Fed. Cir. 2003) (holding that 38 U.S.C. § 7403, which governs appointments of health care professionals under Chapter 74 of Title 38, "specifically exempted such appointments" from the veterans preference process). Plaintiff, therefore, was not entitled to appeal to the MSPB under Chapter 43 of the CSRA.[8]

Plaintiff's apparent lack of remedy under the CSRA does not, however, as plaintiff argues, mean that this court has the power to grant him the remedy he seeks. United States v. Fausto concerned a federal employee who had been suspended for more than 14 days based on misconduct, but who, as a non-preference eligible member of the excepted service, was not included in the definition of employee in the portion of the CSRA, Subchapter II, Chapter 75, providing MSPB and juridical review to employees subject to such suspensions. See United States v. Fausto, 484 U.S. at 446-47. The United States Supreme Court rejected the opinion of the United States Court of Appeals for the Federal Circuit that "the exclusion of nonpreference members of the excepted service from the definitional sections of Chapter 75" constituted "congressional silence on the issue of what review these employees should receive for the categories of personnel action covered by that chapter." Id. at 447. Instead, the Supreme Court held that it was

> evident that the absence of provision for these employees to obtain judicial review is not an uninformative consequence of the limited scope of the statute, but rather manifestation of a considered congressional judgment that they should not have statutory entitlement to review for adverse action of the type governed by Chapter 75.

Id. at 448-49. According to the Supreme Court, the CSRA's "deliberate exclusion of employees in respondent's service category from the provisions establishing administrative and judicial review for personnel action of the sort at issue" prevented the Fausto plaintiff from seeking review of the agency's action under the Back Pay Act in what was then called the United States Claims Court. Id. at 455. Similarly, in the present case,

---

[8] The court also notes that, in an unpublished opinion, the Federal Circuit favorably quoted an MSPB holding that "'38 U.S.C. § 7406 makes plain that civil service regulations do not apply to persons occupying residencies in the Department of Veterans Affairs.'" Vores v. Merit Sys. Prot. Bd., 324 F. App'x 883, 886 (Fed. Cir. 2009) (quoting Swango v. Dep't of Veterans Affairs, 59 M.S.P.R. 235, 239 (1993)).

plaintiff's lacks a remedy under the CSRA does not entitle him to have his claims heard in this court. See <u>Semper v. United States</u>, 694 F.3d 90, 92 (Fed. Cir. 2012) ("[B]ecause Mr. Semper is a member of the excepted service, the CSRA forecloses his right to seek review of his termination in the Court of Federal Claims."); <u>Khan v. United States</u>, 201 F.3d at 1381-82 ("Accordingly, the specific *exclusion* of Dr. Khan from the CSRA provisions covering involuntary retirement claims prevents him from seeking review in the Court of Federal Claims under the Tucker Act." (emphasis in original) (citing <u>United States v. Fausto</u>, 484 U.S. at 455)); <u>Gallo v. United States</u>, 76 Fed. Cl. 593, 600 (2007), <u>aff'd</u>, 529 F.3d 1345 (Fed. Cir. 2008) ("Under the reasoning of *Fausto*, the fact that the regulations permit employees who recover from occupational injuries within one year to file such claims [with the MSPB], but do not permit employees who recover *after* one year to do so, indicates that administrative and judicial review of improper restoration claims by the latter group has been barred altogether." (emphasis in original) (citing <u>United States v. Fausto</u>, 484 U.S. at 446–47)). "To allow 'resort to alternative remedies for complaints about matters within the statute's scope would undermine the CSRA because the statute "prescribes in great detail the protections and remedies applicable to such action, including the availability of administrative and judicial review."'" <u>Gallo v. United States</u>, 76 Fed. Cl. at 600 (quoting <u>Ayrault v. Pena</u>, 60 F.3d 346, 348 (7th Cir. 1995) (quoting <u>United States v. Fausto</u>, 484 U.S. at 443)).

Even were the court not barred by the CSRA from hearing plaintiff's due process claim, it would still lack jurisdiction to hear plaintiff's due process claim on the second ground cited by defendant, plaintiff's failure to cite a money-mandating source of law. In various places in his filings, plaintiff cites three statutes and regulations as alleged sources of jurisdiction for his due process claim: 38 U.S.C. § 7406, Army Regulation 40-68, and Army Regulation 351-3. Plaintiff also cites the Back Pay Act, 5 U.S.C § 5596, as an "alternate" authority to support his due process claim. The first provision cited by plaintiff in support of jurisdiction, 38 U.S.C. § 7406, states, in relevant part:

> (a)(1) The Secretary [of the VA] <u>may</u> establish residencies and internships. The Secretary <u>may</u> appoint qualified persons to such positions without regard to civil service or classification laws, rules, or regulations.
>
> * * *
>
> (b) The Secretary <u>may</u> prescribe the conditions of employment of persons appointed under this section, including necessary training, and the customary amount and terms of pay for such positions during the period of such employment and training. The amount and terms of such pay <u>may</u> be established retroactively based on changes in such customary amount and terms.

38 U.S.C. § 7406(a), (b) (emphasis added). "There is a presumption that the use of the word 'may' in a statute creates discretion." <u>Doe v. United States</u>, 463 F.3d 1314, 1324 (Fed. Cir. 2006) (citing <u>Doe v. United States</u>, 100 F.3d 1576, 1582 (Fed. Cir.1996)). This presumption may be rebutted

when an analysis of congressional intent or the structure and purpose of the statute reveal one of the following: (1) the statute has "clear standards for paying" money to recipients, (2) the statute specifies "precise amounts" to be paid, or (3) the statute compels payment once certain conditions precedent are met.

Doe v. United States, 463 F.3d at 1324 (citing Samish Indian Nation v. United States, 419 F.3d 1355, 1364–65 (Fed. Cir. 2005)). Because none of these three elements is present in 38 U.S.C. § 7406, the court finds that the statute grants the Secretary of the VA discretion as to whether to establish medical residencies, who among qualified applicants to appoint to such residencies, and the amount to be paid to residents after their appointment. Section 7406 is, therefore, not money mandating as to medical residents such as plaintiff.

Plaintiff also cites Army Regulation 40-68 in support of his position that this court has jurisdiction to hear his claims. Initially, the court notes that, although plaintiff cites Army Regulation 40-68 in the jurisdiction portion of his complaint, plaintiff otherwise fails to explain how or which portion of the 172-page regulation is money-mandating. Indeed, plaintiff fails even to mention Army Regulation 40-68 in his response to defendant's motion to dismiss. Regardless, Army Regulation 40-68, a copy of which was provided by defendant as an attachment to its motion to dismiss, is titled "Medical Services: Clinical Quality Management" and dated March 26, 2004. Army Regulation 40-68 states that its purpose is to "establish[] policies, procedures, and responsibilities for the administration of the Army Medical Department (AMEDD) Clinical Quality Management Program (CQMP)." Army Reg. 40-68, para. 1-1. Among the procedures that Army Regulation 40-68 establishes are those for the management of "adverse privileging/practice actions" against health care providers at Army medical treatment facilities, which are defined to include "[t]he denial, suspension, restriction, reduction, or revocation of clinical privileges/practice based upon misconduct, professional impairment, or lack of professional competence." Army Reg. 40-68, para. 10-1. The regulation enumerates certain procedural rights to which health care providers who are facing adverse action are entitled, including the rights: to timely notice that a commander has recommended adverse action; to request or waive a hearing on the imposition of the proposed adverse action; to participate in the hearing; and to have prior access to all that information that is to be presented at the hearing. See Army Reg. 40-68, para. 10-7. A grant of procedural rights is not, however, in and of itself, money mandating. Further, review of the entirety of Army Regulation 40-68 does not reveal any provision that entitles health care providers to the payment of money. Army Regulation 40-68, thus, is not money-mandating and cannot serve as a source of jurisdiction for plaintiff's due process claims.

The second regulation cited by plaintiff in support of jurisdiction is Army Regulation 351-3. A copy of Army Regulation 351-3 also was provided by defendant as an attachment to its motion to dismiss. Army Regulation 351-3 is dated October 15, 2007 and is titled "Schools: Professional Education and Training Programs of the Army Medical Department." The regulation describes its purpose as to "establish[] policy procedures for advanced education obtained at Federal and non-Federal institutions." Army Reg. 351-3, para. 1-1. Plaintiff points to three provisions of Army Regulation 351-3 that he argues

demonstrate that Army Regulation 351-3 is money-mandating and applicable to plaintiff, paragraphs 1-1(a), 6-6, and 6-5(d).

The first provision of Army Regulation 351-3 cited by plaintiff in support of his case is paragraph 1-1(a), which states that Army Regulation 351-3 "sets forth standards and requirements for . . . [f]ormal education and training of U.S. Army Medical Department (AMEDD) personnel." Plaintiff argues, citing a 2011 article on the history of the Army Medical Civilian Corps and a description of the Army Medical Civilian Corps from its webpage, that "[t]he term 'AMEDD personnel' includes civilians." While this may be true in other contexts, it is not true within the context of Army Regulation 351-3, which defines "Army Medical Department personnel" solely in terms uniformed officer and enlisted members of the Army. See "Army Medical Department Personnel," Army Reg. 351-3, Glossary, Section II ("All officer personnel who are members of the six AMEDD Corps, WOs [Warrant Officers] whose control branch is one of the six AMEDD Corps, and all EN [Enlisted Corps] personnel in career management field 91."). Although plaintiff argues that he was employed by the Army during his tenure at WBAMC, an assertion, with which, as discussed above, the court disagrees, he admits that he was a civilian throughout that time. Thus, plaintiff did not qualify as AMEDD personnel, as the term is used in Army Regulation 351-3, and plaintiff's argument that Army Regulation 351-3 is money-mandating is not aided by Army Regulation 351-3, paragraph 1-1(a).

Plaintiff next cites to paragraph 6-6 of Army Regulation 351-3, which states that "[a]ll trainees in GME [Graduate Medical Education] must be afforded due process as prescribed by policy issued by TSG [The Surgeon General] and as outlined by the ACGME institutional requirements." The term "Trainee" is defined as "[a] student who is enrolled not less than half-time in an educational institution which requires clinical training as part of a health care education or training program," a definition which could fit the plaintiff during his time at WBAMC. "Trainee," Army Reg. 351-3, Glossary, Section II. Paragraph 6-6, however, constitutes, at best, a grant of procedural rights. As noted above, such a grant, in and of itself, is not money mandating.

Finally, plaintiff cites paragraph 6-5(d) of Army Regulation 351-3, which states that "[t]he Army offers GME training in military programs and sponsored and non-sponsored civilian programs. . . . Sponsored civilian trainees will remain on AD [Active Duty] and receive full pay and allowances." Army Reg. 351-3, para. 6-5(d). The language that sponsored civilian trainees "will . . . receive full pay and allowances" could be money-mandating. There is however, no evidence in the record that plaintiff was "sponsored" by the Army, and, thus, that the provision is applicable to plaintiff. Although plaintiff argues that, during all relevant times, Dr. Refaei was an employee of the Army, and that he "transferred to the Army from the Department of Veterans Affairs (DVA) pursuant to 38 U.S.C. § 7406," there is no evidence in the record that Dr. Refaei's employer ever changed from the VA to the Army or that he was ever formally appointed to the a position in the Army. Instead, plaintiff's SF-50 states that his employing agency was the Department of Veterans Affairs and that his appointment there was "FOR DURATION OF THIS TRAINING UNLESS SOONER TERMINATED." Nor does any provision of 38 U.S.C. § 7406 provide the Secretary of the VA the power to "transfer[]" a resident to a different agency as plaintiff asserts. The conclusion that plaintiff was not "sponsored" by

the Army is furthered by the language in paragraph 6-6(d) that "[s]ponsored civilian trainees will remain on AD [Active Duty]." At the very least a requirement that an individual remain on active duty would seem to imply that the individual was an employee of a branch of the United States military. As discussed above, however, the record before the court demonstrates that plaintiff was an employee of the VA rather than the Army during his tenure at WBAMC. That VA appointees such as plaintiff serving as residents at WBAMC were not intended to be subject to Army Regulations is evidenced by a portion of Plaintiff's Resident Agreement stating:

> The training programs at William Beaumont Army Medical Center acquire residents through several different sources. These Fiscal Agencies provide the financial support and specific benefits for their respective group of residents. (Example, U.S. Army, Veterans Affairs, and Texas Tech University). Each of these agencies has it's [sic] own set of formal polices and contracts specific to employment with that entity. (Example, Army Regulations).

This language suggests that the administrators of WBAMC envisioned that medical residents serving at WBAMC would remain subject to the policies and regulations of their appointing agencies, such as, in plaintiff's case, the VA, rather than automatically being made subject to Army Regulations. The evidence in the record, therefore, demonstrates, that Army Regulation 351-3 was not applicable to plaintiff during the period at issue and, thus, cannot serve as a source of jurisdiction for his claims.

Plaintiff also argues that the Back Pay Act, 5 U.S.C. § 5596, serves as an "alternate" authority to support his due process claim. The Back Pay Act provides, in relevant part:

> (b)(1) An employee of an agency who, on the basis of a timely appeal or an administrative determination (including a decision relating to an unfair labor practice or a grievance) is found by appropriate authority under applicable law, rule, regulation, or collective bargaining agreement, to have been affected by an unjustified or unwarranted personnel action which has resulted in the withdrawal or reduction of all or part of the pay, allowances, or differentials of the employee--
>
> > (A) is entitled, on correction of the personnel action, to receive for the period for which the personnel action was in effect--
> >
> > > (i) an amount equal to all or any part of the pay, allowances, or differentials, as applicable which the employee normally would have earned or received during the period if the personnel action had not occurred, less any amounts earned by the employee through other employment during that period . . . .

5 U.S.C. § 5596(b)(1) (2012). "The statute's language was intended to provide a monetary remedy for wrongful reductions in grade, removals, suspensions, and 'other unwarranted or unjustified actions affecting pay or allowances (that) could occur in the course of reassignments and change from full-time to part-time work.'" United States v. Testan, 424 U.S. at 405 (quoting S. Rep. No.1062, 89th Cong., 2d Sess., 3 (1966), U.S. Code Cong. & Admin. News 1966, pp. 2097, 2099). However, "[t]he Back Pay Act is not itself a jurisdictional statute. It is merely derivative in application, depending on a prior finding of appropriate jurisdiction in the Claims Court." Mitchell v. United States, 930 F.2d 893, 897 n. 3 (Fed. Cir. 1991) (citing United States v. Connolly, 716 F.2d 882, 887 (Fed. Cir.1983) and Shelleman v. United States, 9 Cl. Ct. 452 (1986)). Thus, "[u]nless some other provision of law commands payment of money to the employee for the 'unjustified or unwarranted personnel action,' the Back Pay Act is inapplicable." Spagnola v. Stockman, 732 F.2d 908, 912 (Fed. Cir. 1984) (quoting United States v. Connolly, 716 F.2d at 887). Because plaintiff has failed to cite to any such provision of law mandating the payment of money to him for the Army's alleged violations of the Due Process Policy and the Army Regulations cited by plaintiff, "the Back Pay Act itself cannot fill that gap." Id.; see also United States v. Connolly, 716 F.2d at 887 (holding that the Back Pay Act did not provide the United States Claims Court jurisdiction to hear plaintiff's claim because plaintiff "failed to show that his separation from the Postal Service violated any relevant statute or regulation covered by the Tucker Act").

In sum, plaintiff is barred from bringing his due process claim before this court by the CSRA. Even were his claim not barred by the CSRA, plaintiff's due process claim would fail for lack of jurisdiction because plaintiff has failed to cite a money-mandating source of law in support of his claim. Plaintiff's due process claim based on the Due Process Policy and Army Regulations 40-68 and 351-3 is, therefore, dismissed for lack of jurisdiction.[9]

---

[9] In his complaint, plaintiff also cites a provision of the Contract Disputes Act (CDA), 41 U.S.C. § 7102(a)(2), as a source of jurisdiction to his claims, although he fails to specify elsewhere in his filings as to which of his claims the CDA is applicable. Plaintiff's failure to do so, however, is immaterial because the CDA cannot provide jurisdiction for any of plaintiff's claims. Section 7102 (a)(2) of the CDA applies to the "any express or implied contract . . . made by an executive agency for . . . the procurement of services." 41 U.S.C. § 7102(a)(2) (2012). As discussed above, plaintiff has failed to sufficiently allege that he had any sort of contract with the government, let alone one for the procurement of services. Additionally, jurisdiction under the CDA "requires both a valid claim and a contracting officer's final decision on that claim." M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1327 (Fed. Cir. 2010) (citing James M. Ellet Constr. Co. v. United States, 93 F.3d 1537, 1541-42 (Fed. Cir. 1996)). For the purposes of the CDA, a "proper claim" is defined as "a written demand that includes (1) adequate notice of the basis and amount of a claim and (2) a request for a final decision." Id. at 1328. Plaintiff does not allege that he has submitted a proper written claim to a contracting officer or that a contracting officer had ruled on such a claim. In fact, plaintiff admits that he has not done so in his response to defendant's motion to dismiss, stating that, because his case was transferred by the United States Court of Appeals for the Fifth Circuit to this court, which

In support of his third cause of action, his Fifth Amendment claim, plaintiff alleges that defendant's actions violated the Due Process Clause of the Fifth Amendment to the United States Constitution. According to plaintiff, his termination was completed without sufficient due process protection and resulted in the loss of property "in the form of salary, bonuses, and damage to his professional reputation in violation of his property and liberty interests under the due process clause of the Fifth Amendment to the United States Constitution." Defendant seeks to dismiss plaintiff's Fifth Amendment claim for lack of jurisdiction on the grounds the Due Process Clause of the Fifth Amendment is not money-mandating.

The United States Court of Appeals for the Federal Circuit consistently has held that this court does not possess jurisdiction to consider claims arising under the Due Process Clauses of the Fifth and Fourteenth Amendments. See Crocker v. United States, 125 F.3d 1475, 1476 (Fed. Cir. 1997) (no jurisdiction over a due process violation under the Fifth and Fourteenth Amendments (citing LeBlanc v. United States, 50 F.3d at 1028)); see also Smith v. United States, 709 F.3d at 1116 ("The law is well settled that the Due Process clauses of both the Fifth and Fourteenth Amendments do not mandate the payment of money and thus do not provide a cause of action under the Tucker Act." (citing LeBlanc v. United States, 50 F.3d at 1028)); In re United States, 463 F.3d 1328, 1335 n. 5 (Fed. Cir.) ("[B]ecause the Due Process Clause is not money-mandating, it may not provide the basis for jurisdiction under the Tucker Act."), reh'g and reh'g en banc denied (Fed. Cir. 2006), cert. denied sub nom. Scholl v. United States, 552 U.S. 940 (2007); Acadia Tech., Inc. & Global Win Tech., Ltd. v. United States, 458 F.3d 1327, 1334 (Fed. Cir. 2006); Collins v. United States, 67 F.3d 284, 288 (Fed. Cir.) ("[T]he due process clause does not obligate the government to pay money damages."), reh'g denied (Fed. Cir. 1995); Mullenberg v. United States, 857 F.2d 770, 773 (Fed. Cir. 1988) (finding that the Due Process clauses "do not trigger Tucker Act jurisdiction in the courts"); Murray v. United States, 817 F.2d 1580, 1583 (Fed. Cir. 1987) (noting that the Fifth Amendment Due Process clause does not include language mandating the payment of money damages); Harper v. United States, 104 Fed. Cl. 287, 291 n. 5 (2012); Hampel v. United States, 97 Fed. Cl. 235, 238, aff'd, 429 Fed. App'x. 995 (Fed. Cir. 2011), cert. denied, —– U.S. ——, 132 S. Ct. 1105, 181 L. Ed. 2d 973 (2012); McCullough v. United States, 76 Fed. Cl. 1, 4 (2006) ("[N]either the Fifth Amendment Due Process Clause . . . nor the Privileges and Immunities Clause provides a basis for jurisdiction in this court because the Fifth Amendment is not a source that mandates the payment of money to plaintiff."), appeal dismissed, 236 Fed. App'x. 615 (Fed. Cir.), reh'g denied (Fed. Cir.), cert. denied, 552 U.S. 1050, 128 S. Ct. 675, 169 L.Ed.2d 529 (2007). Due process claims "must be heard in District Court." Kam–Almaz v. United States, 96 Fed. Cl. 84, 89 (2011) (citing Acadia Tech., Inc. & Global Win Tech., Ltd. v. United States, 458 F.3d at 1334), aff'd, 682

---

then ordered plaintiff to file a transfer complaint, "[t]here was no opportunity to go back to the contracting officer and make an administrative claim." The fact that plaintiff's case was heard by the Fifth Circuit and transferred to this court, however, would not have prevented plaintiff from pursuing other appropriate avenues for redress. By his own admission, plaintiff has not submitted an administrative claim. Therefore, the jurisdictional requirements of the CDA have not been met.

F.3d 1364 (Fed. Cir. 2012); <u>see also</u> <u>Hampel v. United States</u>, 97 Fed. Cl. at 238. This court, therefore, lacks jurisdiction to hear plaintiff's claim based on the Fifth Amendment to the United States Constitution. With respect to plaintiff's Fifth Amendment claim, defendant's motion to dismiss is granted.[10]

## CONCLUSION

Based on the above discussion, the court lacks jurisdiction to hear any of the causes of action alleged in plaintiff's complaint. Defendant's motion to dismiss is, therefore, **GRANTED**. Plaintiff's complaint is **DISMISSED**. The clerk shall enter **JUDGMENT** consistent with this opinion.

**IT IS SO ORDERED.**

<u>s/Marian Blank Horn</u>
**MARIAN BLANK HORN**
**Judge**

---

[10] Plaintiff's complaint also lists a count titled "**The Army's Actions Were Arbitrary and Capricious**," in which plaintiff alleges that "[t]he Army's unfounded accusation in the ward incident three months before Plaintiff's completion of his residency, its lack of notice, its conduct of the hearing, and other actions alleged" in his complaint were "arbitrary and capricious and not in accordance with law, an abuse of discretion, and not supported by substantial evidence." (emphasis in original). The complaint does not specify the source of law that defendant allegedly violated or that would entitle plaintiff to relief based on these allegations. Plaintiff, further, fails to elaborate on or even mention these allegations in any of his subsequent filings with this court. To the extent that plaintiff's allegations that defendant's actions were "arbitrary and capricious and not in accordance with law, an abuse of discretion, and not supported by substantial evidence" represent a distinct cause of action, such a cause of action must be dismissed for lack of jurisdiction because plaintiff has failed to cite a money-mandating source of law, or indeed any source of law, in support of it, and because no factual basis for the claim has been identified.